UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT DAVIS, et al.,

        Plaintiffs,                        Case No. 17-cv-12100
                                              Hon. Mark A. Goldsmith

vs.

DETROIT PUBLIC SCHOOLS
COMMUNITY DISTRICT, et al.

        Defendants.
_____/

**<u>OPINION & ORDER</u>**
**<u>GRANTING IN PART AND DENYING IN PART DETROIT PUBLIC SCHOOLS</u>**
**<u>DEFENDANTS' MOTION TO DISMISS (Dkt. 25); GRANTING INTERVENOR</u>**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (Dkt. 27); DENYING AS</u>**
**<u>MOOT PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (Dkt. 26); AND</u>**
**<u>DENYING PLAINTIFF'S MOTION FOR LEAVE TO FILE SUPPLEMENTAL BRIEF</u>**
**<u>(Dkt. 43)</u>**

Plaintiffs' lawsuit has two distinct facets. First, Plaintiff Robert Davis complains about allegedly unconstitutional treatment that he received during a June 23, 2017 meeting of Defendant Detroit Public Schools Community District Board of Education. At the same time, Plaintiffs continue their efforts, which began in a prior case, to prevent or undo taxpayer-funded financing of the new Little Caesars sports arena in Detroit, Michigan, as that financing scheme is currently structured. Generally speaking, Plaintiffs claim that the funding scheme violates their rights guaranteed by the U.S. Constitution, because City of Detroit millage voters only consented to be taxed for school purposes. By way of relief, Plaintiffs request that the Board of Education put the funding scheme to a vote of the school electors for the City of Detroit.

Both plaintiffs are Wayne County residents, but only Plaintiff D. Etta Wilcoxon lives in Detroit. Am. Compl. ¶¶ 23-24. The original defendants in this suit are the Detroit Public Schools

Community District, Detroit Public Schools, and the Detroit Public Schools Community District Board of Education, as well as its president, Dr. Iris Taylor, in her official capacity (collectively, "DPS Defendants").[1]  When Plaintiffs filed their amended complaint, they added as defendants Olympia Entertainment Events Center LLC ("Olympia Entertainment"), Palace Sports and Entertainment LLC ("Palace Sports"), and the National Basketball Association ("NBA"). Appearing as intervening defendants are the Detroit Downtown Development Authority ("DDA") and the Detroit Brownfield Redevelopment Authority ("DBRA") (collectively, "Intervenor Defendants") — entities created by local governments, pursuant to a state statute, for the purpose of spurring economic growth and revitalization.

The issues have been fully briefed, and a hearing was held on July 19, 2017.  For the reasons set forth below, DPS Defendants' motion to dismiss is granted in part and denied in part; Intervenor Defendants' motion for summary judgment is granted; and Plaintiffs' motion for partial summary judgment is denied as moot.

## I.  BACKGROUND

In the City of Detroit's November 2012 general election, voters approved the renewal of the 18-mills Detroit Public Schools operating millage.  See Am. Compl. ¶ 170.  Plaintiffs argue that Intervenor Defendants intend to unlawfully use revenue generated from the school operating millage for a purpose other than the one that voters approved.  See id. ¶¶ 253-254, 269-270, 274. Specifically, Intervenor Defendants allegedly plan to reimburse Defendants Olympia Entertainment and Palace Sports approximately $56,500,000 collected pursuant to the millage to fund certain aspects of the relocation of the Detroit Pistons professional basketball team from

---

[1] For simplicity, this opinion often refers to subsets of the DPS Defendants, such as the Board and its president, as "DPS Defendants."  A more specific description would not affect any legal conclusions.

Auburn Hills, Michigan, to Detroit, Michigan.  See id. ¶¶ 266-267.  The DDA intends to reimburse Olympia Entertainment in the amount of $34,500,000 for improvements needed to accommodate the Detroit Pistons at the Little Caesar's arena, and the DBRA intends to reimburse Palace Sports in the amount of $22,000,000 for constructing the Detroit Pistons' practice facility and corporate headquarters.  Id.

Michigan statutes require that all millage proposals "fully disclose each local unit of government to which the revenue from that millage will be disbursed."  See Am. Compl. ¶ 274 (quoting Mich. Comp. Laws § 211.24f(1)).  Under Mich. Comp. Laws § 380.1216, revenues levied for school operating purposes, in particular, may only be used for that purpose without the consent of the local electors.  Id. ¶ 254.  Plaintiffs argue that both statutes have been violated, because the millage ballot proposals did not identify that the funds would be used by non-school entities for the non-school purpose of supporting the relocation of the Pistons to Detroit.

Plaintiffs purport to implicate DPS Defendants in the above-described conduct due to DPS Defendants' alleged refusal to place a proposal on the November 2017 general election ballot through which electors can vote on whether to approve the non-school use of funds.  Olympia Entertainment and Palace Sports are implicated based on their alleged intent to receive reimbursement from Intervenor Defendants, which reimbursement comes from school millage revenues.

## II.  STANDARD OF DECISION

In considering whether to dismiss a complaint under Federal Rule Civil Procedure 12(b)(1) due to lack of subject-matter jurisdiction, the plaintiff bears the burden of proving the existence of subject-matter jurisdiction.  Musson Theatrical, Inc. v. Fed. Express Corp., 89 F.3d 1244, 1248 (6th Cir. 1996).  If the motion attacks the assertion of subject matter jurisdiction set out in the

complaint, the court accepts the complaint's allegations as true and construes them in the light most favorable to the non-moving party.  United States v. A.D. Roe Co., Inc., 186 F.3d 717, 721-722 (6th Cir. 1999).  A motion that alleges lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).  See Stalley v. Methodist Healthcare, 517 F.3d 911, 916 (6th Cir. 2008) ("We review de novo a district court's dismissal of a case for lack of standing — lack of subject matter jurisdiction — under Fed. R. Civ. P. 12(b)(1).").

On a motion to dismiss pursuant to Rule 12(b)(6), on the other hand, "[t]he defendant has the burden of showing that the plaintiff has failed to state a claim for relief."  Directv, Inc. v. Treesh, 487 F.3d 471, 476 (6th Cir. 2007) (citing Carver v. Bunch, 946 F.2d 451, 454-455 (6th Cir. 1991)).  Such a motion "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Id.  The plausibility standard requires courts to assume that all the alleged facts are true, even when their truth is doubtful, and to make all reasonable inferences in favor of the plaintiff.  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555-556 (2007); In re NM Holdings Co., LLC, 622 F.3d 613, 618 (6th Cir. 2010).  The complaint "does not need detailed factual allegations."  Twombly, 550 U.S. at 555; see also Erickson v. Pardus, 551 U.S. 89, 93 (2007) ("specific facts are not necessary").  It needs only enough facts to suggest that discovery may reveal evidence of actionability, even if the likelihood of finding such evidence is remote.  Twombly, 550 U.S. at 556.  Evaluating a complaint's plausibility is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009).

## III.  DISCUSSION

### A.  Plaintiffs Lack Standing to Challenge the Tax Increment Finance Plan

Counts VII, VIII, and X through XIV allege, in one way or another, that DPS Defendants, Olympia Entertainment, and Palace Sports are complicit in the wrongful diversion of school millage revenue away from school use.  Plaintiffs allege that the diversion and use of this millage revenue for non-school purposes, without notice to and approval by the school electors, violates Mich. Comp. Laws § 380.1216 and Mich. Comp. Laws § 211.24f, as interpreted by Debano-Griffin v. Lake County, 782 N.W.2d 502 (Mich. 2010); City of South Haven v. Van Buren County Board of Commissioners, 734 N.W.2d 533 (Mich. 2007); and In re Request for Advisory Opinion on Constitutionality of 1986 PA 281, 422 N.W.2d 186 (Mich. 1988).

In addition to the Article III criteria that every case before a federal court must satisfy, state-law standing principles must also be satisfied when a plaintiff brings a state-law claim in a federal court.  See Aarti Hosp., LLC v. City of Grove City, Ohio, 350 F. App'x 1, 6 (6th Cir. 2009).  Accordingly, this Court will apply Michigan's standing doctrine as set forth in Lansing Schools Education Association v. Lansing Board of Education, 792 N.W.2d 686 (Mich. 2010).

Previous to Lansing Schools, Michigan standing jurisprudence tracked federal standing jurisprudence.  See Lansing Schs., 792 N.W.2d at 693 (standing doctrine in Michigan was "essentially coterminous with the federal doctrine").  Concluding that Michigan's constitution lacked the U.S. Constitution's "case or controversy" language, however, Lansing Schools marked Michigan's return "to a limited, prudential doctrine that is consistent with Michigan's long-standing historical approach to standing."  Id. at 699.  Lansing Schools articulated the test for standing as follows:

> A litigant has standing whenever there is a legal cause of action. Further, whenever a litigant meets the requirements of MCR 2.605

> [declaratory judgments], <u>it is sufficient to establish standing to seek a declaratory judgment</u>. Where a cause of action is not provided at law, then a court should, in its discretion, determine whether a litigant has standing. A litigant may have standing in this context if the litigant has a special injury or right, or substantial interest, that will be detrimentally affected in a manner different from the citizenry at large or if the statutory scheme implies that the Legislature intended to confer standing on the litigant.

<u>Id.</u> (emphasis added).

Plaintiffs do not attempt to argue that they have standing based on having a cause of action at law; nor do they expressly claim that they have suffered a special injury. Rather, Plaintiffs assert that they have standing because they meet the requirements of Mich. Ct. R. 2.605. <u>See</u> Pls. Mot. for Summ. J. at 10 & n.1, 20-21; Pl. Resp. to Intervenor Defs. Mot. for Summ. J. at 6-8. The court rule provides as follows:

> In a case of actual controversy within its jurisdiction, a Michigan court of record may declare the rights and other legal relations of an interested party seeking a declaratory judgment, whether or not other relief is or could be sought or granted.

Mich. Ct. R. 2.605(1).

<u>Lansing Schools</u> was not entirely clear whether it created a regime under which special injury or interest was required to establish standing to seek a declaratory judgment.[2] Later cases, however, clarify that Mich. Ct. R. 2.605 does incorporate the prerequisite of a special injury different from that suffered by the general public. <u>See, e.g.</u>, <u>UAW v. Cent. Mich. Univ. Trs.</u>, 815 N.W.2d 132, 138-139 (Mich. Ct. App. 2012) (finding standing under Mich. Ct. R. 2.605 in part because plaintiffs alleged an interest "different from any rights or interests of the public at large");

---

[2] <u>Lansing Schools</u> is also unclear regarding what it meant when it stated that standing is established when the plaintiff has a legal cause of action. The court may have meant that a plaintiff has standing where a statute creates standing for the assertion of a statutorily created cause of action. Because Plaintiffs here do not base standing on that language in <u>Lansing Schools</u>, the ambiguity in the opinion need not be resolved.

<u>Duck Lake Riparian Owners Ass'n v. Fruitland Twp.</u>, No. 312295, 2014 WL 891079, at *5-6 (Mich. Ct. App. Mar. 6, 2014) (noting in general that, as to plaintiffs asserting standing under <u>Lansing Schools</u>' "cause of action" theory and Mich. Ct. R. 2.605, "plaintiffs' standing would still depend on having some kind of harm distinct from that of the general public"); <u>Greenstein v. Farmington Pub. Sch.</u>, No. 306268, 2012 WL 4222066, at *2 (Mich. Ct. App. Sept. 20, 2012) (rejecting standing under Mich. Ct. Rule 2.605 because plaintiff failed to allege "any interest that is detrimentally affected in a manner different from the citizenry at large").  Rule 2.605 "<u>does not limit or expand</u> the subject-matter jurisdiction of the courts, but instead <u>incorporates the doctrine[ ] of standing</u> . . . ." <u>Cent. Mich. Univ. Trs.</u>, 815 N.W.2d at 138 (emphasis added)).

Plaintiffs lack standing because they allege no injury apart from that suffered by all school electors in Detroit.  <u>See also</u> Am. Compl. ¶ 136 ("[T]his fundamental right has been denied Plaintiff Wilcoxon and other registered and qualified electors of the City of Detroit . . . .").  The only possible allegation that might be construed as a claim of specialized injury is their allegation that they are "the <u>only</u> electors who submitted a written demand on DPS Defendants to place the TIF issue on the November 2017 ballot."  Pls. Resp. to Intervenor Defs. Mot. for Summ. J. at 8 (emphasis in original).  But having made a demand does not show any special injury.  Any alleged injury traceable to DPS Defendants would flow from the failure to place a proposal on the ballot — an injury, if it were one, that all Detroit voters would suffer, regardless of who made a demand on DPS Defendants or whether any demand was made at all.

The same deficiency applies to the claims in Counts XII and XIII, directed at Olympia Entertainment, Palace Sports, and the NBA.  <u>See, e.g.</u>, Am. Compl. ¶¶ 16-17.  In those counts, Plaintiffs ask for a declaration that these entities cannot be reimbursed with revenue collected pursuant to a school millage, because to do so would violate state law.  <u>Id.</u>  Even assuming that

Plaintiffs are correct about the alleged wrongdoing, it affects them no differently than any other elector in the City of Detroit.

Therefore, Plaintiffs' claims against DPS Defendants and Intervenor Defendants in Counts VII, VIII, and X through XIV, and all claims against Olympia Entertainment, Palace Sports, and the NBA are dismissed with prejudice.

### C. Michigan's <u>Bigger</u> Doctrine

Even if this Court is in error regarding Plaintiffs' lack of standing to bring the majority of their state-law claims, all of Plaintiffs' state-law claims — including the mandamus claim in Count IX — are subject to dismissal on account of their dilatory conduct vis-à-vis the widely publicized progress of the Little Caesars arena.

In the specific context of public works financing, Michigan law recognizes what Intervenor Defendants aptly term a "corollary" to laches, <u>see</u> Intervenor Defs. Mot. for Summ. J. at 20.[3] That doctrine arose in <u>Bigger v. City of Pontiac</u>, 210 N.W.2d 1 (Mich. 1973), which case did not mention the equitable doctrine of laches. In fact, the doctrine is distinct from laches, because "<u>Bigger</u> applies even if plaintiff's claim is legal rather than equitable." <u>Bylinski v. City of Allen Park</u>, 8 F. Supp. 2d 965, 973 (E.D. Mich. 1998) (citing <u>Walled Lake Consol. Sch. Dist. v. Charter Twp. of Commerce</u>, 437 N.W.2d 16, 17 (Mich. Ct. App. 1989)), <u>aff'd</u>, 169 F.3d 1001 (6th Cir. 1999).

---

[3] Laches is an equitable affirmative defense that requires the defendant to show two elements: (i) unreasonable delay by the plaintiff in asserting his or her rights; and (ii) a resulting prejudice to the defending party. <u>Brown-Graves Co. v. Cent. States, Se. & Sw. Areas Pension Fund</u>, 206 F.3d 680, 684 (6th Cir. 2000). The defense takes into account "the passage of time combined with a change in condition which would make it inequitable to enforce a claim against the defendant." <u>Tray v. Whitney</u>, 192 N.W.2d 628, 631 (Mich. Ct. App. 1971).

In Bigger, the defendant publicized, on April 23, 1973, its plans for a bond sale to publicly finance improvements to a professional football stadium. "[T]he plaintiffs allowed the balance of the month of April, all of the months of May and June and half of the month of July to pass without commencing any legal proceedings." Id. at 3. After a procedural misstep in mid-July 1973, the plaintiffs properly commenced the action on August 1, 1973, after the bonds had been sold and one month before the bonds were to be delivered. Id. The Michigan Supreme Court dismissed the case based upon that delay and its potential effect on the defendants, stating:

> In cases where because of the nature of the subject matter, absolute time limits must be observed, the law requires speedy resort to the courts by those who wish to prevent or modify contemplated transactions or procedures. Those who would avail themselves of our processes must do so in a manner which facilitates an orderly process of adjudication within the given time frame. . . . In this case had the plaintiffs in April, rather than inexplicably waiting until August, instituted this action, there would have been adequate time for preparation, presentation and reflection.

Id.

Here, voters approved the Detroit school millage in a 2012 election. See Am. Compl. ¶ 110. In a tax increment financing ("TIF") plan adopted by the DDA in June 2013 and approved by the Detroit City Council in December 2013, the DDA announced its intent to immediately begin capturing revenue attributable to taxes collected for school purposes. See 2013 TIF Plan, Ex. 2 to Intervenor Defs. Mot. for Summ. J., at 43, 207 (noting intent to use "tax increment revenues described in [Mich. Comp. Laws] § 125.1651(cc)(vi)," which statute authorizes capture of, inter alia, ad valorem property taxes levied by local and intermediate school districts) (Dkt. 27-3); see also Am. Compl. ¶ 152 ("On June 26, 2013, the DDA Board of Directors passed a resolution designating the new Little Caesars Arena as its 'catalyst development project' [i.e., a project to be

funded through a TIF plan].").[4]  The purpose of this tax capture included the "primary component"

of "a multi-purpose sports and entertainment center"; the TIF Plan named the Detroit Red Wings

professional hockey team as a fixture of the arena, and it expressly contemplated "other sports and

entertainment events."  TIF Plan at 205.

The tax capture at issue in this case is a modification to that preexisting plan, which

modification was made public late last year and will be effectuated by refinancing the outstanding

series of bonds with a new series of bonds backed by the same income stream — not by capturing

millage proceeds from new sources.  See MOU, Ex. 1 to Intervenor Defs. Mot. for Summ. J., at 3

(Dkt. 27-2) ("DDA has determined that there is a public purpose to modify the existing public-

private partnership for the Arena to incorporate the construction of [basketball facilities] . . . ."), 6

(stating intent to refinance outstanding bonds and leverage existing tax increment revenues to raise

additional monies); see also Bill Shea & Kirk Pinho, Biggest Tabs for Public Arena Debt?  Gilbert,

GM, Crain's Detroit Business (Dec. 11, 2016), Ex. 6 to Defs. Mot. for Summ. J., at 121 (cm/ecf

---

[4] The Michigan Supreme Court explains a tax increment financing plan as follows:

> [A] tax increment financing (TIF) plan allows a local government to
> finance public improvements in a designated area by capturing the
> property taxes levied on any increase in property values within the
> area.  Under a TIF plan, a base year is established for the project
> area. In subsequent years, any increase in assessments above the
> base year level is referred to as the captured value.  All, or a portion,
> of the property taxes levied on the captured value . . . is diverted to
> the area's development plan.
>
> Tax increment financing is premised on the theory that, without the
> redevelopment project, property values would not increase, or that
> increases in land values and assessments in the project area are
> caused by the redevelopment authority's own construction of
> economic activity in the district.

In re Request for Advisory Opinion on Constitutionality of 1986 PA 281, 422 N.W.2d 186, 189
(Mich. 1988) (citations omitted).

page) (Dkt. 27-7) ("extending the original maturity date three years to 2048, to generate $34.5 million . . . ."); Am. Compl. ¶¶ 131, 135 (acknowledging 2016 plan's connections to the 2013 plan).

Plaintiffs insist that the tax increment capture of these millage revenues was sprung on the public just two months ago:  Wilcoxon avers that she first learned of the tax increment finance plan at the Detroit City Council's May 25, 2017 public hearing.  See Wilcoxon Aff., Ex. 1 to Pls. Resp. to Intervenor Defs. Mot. for Summ. J., ¶ 10 (Dkt. 34-2).

However, when Wilcoxon subjectively became aware of any particular event is irrelevant under Bigger.  What is relevant is what information was reasonably available to the public at large. See Bigger, 210 N.W.2d at 2-3 (critical date was when agreement was "announced to the public"). Here, Defendants submitted unrebutted evidence proving that Plaintiffs were in a position to judicially oppose the instant project and its tax increment finance plan — not a little under three months ago (as was deemed too slow in Bigger), but up to four years ago.  As noted above, the capture of the taxes at issue here is a modification to a tax increment financing plan that has been in place, and well-publicized, for years.

It is a feature of large development projects, like the Little Caesar's arena, that they evolve over time.  Rarely, if ever, does a multi-year, billion-dollar construction project debut in a form identical to the one seen in the original blueprints or the conceptual model.  This flexibility is necessary; the size and duration of projects like these present a particularly acute need to adapt to factors that might not face a smaller project, such as changes to the community, the local or national economic landscape, political sensitivities, and the like.  When, as here, the general financing scheme has been public knowledge since the beginning, permitting a plaintiff to upset a particular stage of the evolution of the project is to permit a plaintiff to upset the project itself.  The

core of Plaintiffs' legal arguments concerning Mich. Comp. Laws § 380.1216 were available to them, as against these Defendants, for an inexcusably long period of time.  This Court sees no meaningful distinction between challenges to the original plan and amendments to that plan that were added to the project as it materialized.

Even if this Court were inclined to recognize a distinction between the project at large and the recent amendments, the December 2016 MOU — which was entered into by the DDA, the City of Detroit, and Palace Sports — noted its intent to use "state and local school taxes" for the instant "catalyst development project."  See MOU at 1.  That the plan would capture school millage funds, in particular, was well-reported by the news media.  See, e.g., Bill Shea, Council Puts Check on Arena Financing, Wants Details First, Crain's Detroit Business (Dec. 8, 2013), Ex. 3 to Intervenor Defs. Mot. to Dismiss, at 84 (cm/ecf page) ("The bonds will be repaid by . . . school taxes within the DDA district . . . ."); JC Reindl, $24.4 Million Garage Helps Ilitch Meet Arena Goal, Detroit Free Press (Oct. 1, 2016), Ex. 3 to Defs. Mot. to Dismiss at 117 (cm/ecf page) ("[S]ome of that Detroit property tax money would be redirected from Detroit schools . . . .").

In their reply brief to the response to their own motion for partial summary judgment, Plaintiffs argue that Bigger is distinguishable on a handful of grounds.  In Bigger, the first attempt at suit was not filed until a day after the bonds' sale.  In this case, on the other hand, Plaintiffs assert that "[n]o bonds have been sold . . . ."  See Pl. Reply to DPS Resp. at 6 (Dkt. 37).[5]  They

---

[5] In their July 17, 2017 reply brief, Plaintiffs also assert that the NBA's decision on Palace Sports' request to approve the move of the Detroit Pistons to the new Little Caesars Arena is not expected "for at least another 30 days."  Pl. Reply to DPS Resp. at 6-7 (citing Vince Ellis, Pistons-Olympia Lease Deal Presented to NBA Today as Moving Process Continues, Detroit Free Press (July 11, 2017) (Dkt. 37-1).  The cited article says no such thing.  Dated July 11, it states that a summary report will be sent to the NBA's Board of Governors "within two weeks" [i.e., by July 25, 2017], and it pegs the NBA's "final vote" as occurring "shortly thereafter."  The other article in that exhibit is in accord, referring to an NBA Board of Governors vote occurring roughly two weeks after July 11, 2017.  See Vince Ellis, Lease Deal between Pistons, Olympia Signed, to be Presented

also argue that, because Olympia Entertainment and Palace Sports have already advanced the costs of construction and merely seek reimbursement from the tax increment financing plan, construction is not in jeopardy, as it was in Bigger. Id. at 7. Finally, Plaintiffs assert that this Court has determined that it has adequate time to adjudicate the merits of this case. Id. at 7-8 (citing 7/10/2017 Order (Dkt. 23)).

First, there is no merit to Plaintiffs' argument that the key date in Bigger was the bonds' sale, which occurred shortly before that suit was filed. Bigger itself certainly makes no such distinction; Bigger contemplated whether the plaintiffs' delay precluded the "orderly process of adjudication" of the case.[6] See also Sessa v. Macomb Cnty., 559 N.W.2d 70, 73 (Mich. Ct. App. 1996) ("[The suit in Bigger] was deemed untimely because it was not commenced until soon before the planned date of issuance of the bonds and thus would have prevented an orderly process of adjudication. However, the applicability of Bigger is broader than this."); Walled Lake Consol. Sch. Dist. v. Charter Twp. of Commerce, 437 N.W.2d 16, 17 (Mich. Ct. App. 1989) ("Plaintiff would have us limit Bigger to its facts . . . . For us to do so would be a disservice to the Bigger rule. Bigger . . . make[s] it clear that the rule was designed to deal with challenges which could prevent or frustrate public improvements in general.").

Of particular note is Bigger's observation that "[o]rderly presentation of the claims here asserted would appear to require an evidentiary hearing," 210 N.W.2d at 4, thus evincing a concern

---

to NBA Today, Detroit Free Press (July 10, 2017). Clearly, time is of the essence because of the imminent need for NBA approval of the Pistons' move to Detroit in advance of the upcoming basketball season.

[6] Bigger noted that, "had the plaintiffs in April, rather than inexplicably waiting until August, instituted this action, there would have been adequate time for preparation, presentation and reflection." 210 N.W.2d at 5. The bonds had been sold on July 17, 1973. Id. If the sale of the bonds in July had some significance, it is likely that the Michigan Supreme Court would not have suggested that suit should have been filed as far back as April.

with a protracted legal process.  In response to this Court's conversion of Intervenor Defendants' motion to dismiss to one for summary judgment (Dkt. 29), Plaintiffs promptly filed affidavits indicating their desire to obtain affidavits, expert witnesses, and copious depositions (Dkts. 32, 33).  If this case proceeds at the speed that they would like, there is no doubt that it would cause a harmful delay to the project.  This is the type of gamesmanship that the <u>Bigger</u> doctrine exists to address.  <u>See</u> <u>Langs v. Pontiac</u>, 293 N.W.2d 659 (Mich. Ct. App. 1980) ("[B]ut for a <u>Bigger</u> rule, projects duly adopted by elected government officials could be delayed and frustrated virtually indefinitely by artful applications of various phases of the judicial process.").

More importantly, the implications of Plaintiffs' success in this case on the merits would ripple back through time, calling into doubt the legitimacy of the already-issued, already-delivered bonds that have financed the Little Caesar's arena construction to date.  As noted above, it has been public knowledge for years that millages — ostensibly collected for school use — have been captured, in part, for this very project.  Permitting Plaintiffs to proceed on the merits of an argument that, in principle, could invalidate <u>all</u> tax increment financing for this project that was backed by school millage funds — when that argument could have been raised earlier — is not permissible under <u>Bigger</u>.  <u>See</u> <u>Sessa</u>, 559 N.W.2d at 73 ("[W]here suit was not begun until after the bonds had been issued and sold on the open market[,] [t]he interests of third parties, the bondholders, who are bona fide purchasers for value and who, at the time of purchase, were not on notice of any such challenge, represents a vested interest that the entertaining of such litigation on its merits could defeat.").

Therefore, under the <u>Bigger</u> doctrine, all of the state law claims must be dismissed.[7]

**D. Plaintiffs' Federal-Law Claims**[8]

In the body of the amended complaint, the federal-law claims, like the state-law claims, only request declaratory relief; if the amended complaint was truly so limited, it would grant this Court discretion whether to exercise jurisdiction, <u>see</u> <u>Scottsdale Ins. Co. v. Roumph</u>, 211 F.3d 964, 968 (6th Cir. 2000). But Count XVI and the amended complaint's "prayer for relief" section request "compensatory, punitive and nominal damages against the Defendants Board of Education and Taylor for violating Plaintiffs' constitutional rights." <u>See</u> Am. Compl. ¶¶ 293, 294; <u>id.</u> at 77 ("Prayer for Relief"). Accordingly, this Court will address the non-discretionary bases for dismissal.

### i. First Amendment Retaliation

In Count I of the amended complaint, Plaintiffs accuse DPS Defendants of chilling the exercise of Davis's First Amendment rights and retaliating against him for the same at a June 23,

---

[7] Jurisdictional issues, such as standing, of course must be considered before non-threshold issues. <u>See</u> <u>Aarti Hosp.</u>, 350 F. App'x at 5. This Court offers the <u>Bigger</u> analysis in the alternative to its holdings on standing. Regarding Count IX (mandamus), however, <u>Bigger</u> serves as this Court's primary rationale, because — as Intervenor Defendants conceded at the July 19, 2017 hearing — Plaintiffs' mandamus claim likely is subject to a comparatively relaxed standing requirement, under which no specialized harm must be shown. <u>See</u> <u>Berry v. Garrett</u>, 890 N.W.2d 882, 887 (Mich. Ct. App. 2016) (recognizing relaxed standing requirement for mandamus claims related to elections).

Relatedly, DPS Defendants asked this Court to abstain from deciding the merits of Plaintiffs' state tax law claims. <u>See</u> DPS Mot. to Dismiss at 15-16. This request is moot; by disposing of the state-law claims on the basis of standing and <u>Bigger</u>, this Court did not reach the merits of those claims.

[8] Intervenor Defendants claim that <u>Bigger</u> applies to Counts IV through XIII. <u>See</u> Intervenor Defs. Mot. for Summ. J. at 20. This Court disagrees, in part; <u>Bigger</u> is a state-law doctrine that likely cannot apply to dismiss Counts IV through VII, which purport to raise federal claims. However, in light of the independent reasons for dismissing those claims discussed presently, the overbreadth of Intervenor Defendants' argument is moot.

2017 meeting.  Davis claims that he requested that the Board of Education place a question on the City of Detroit's November 2017 ballot, asking the registered voters to approve or disapprove Intervenor Defendants' use of millage funds.  Am. Compl. ¶ 38.

In response to Davis raising his hand to "rebut" certain "falsehoods" at the June 23 meeting, Taylor allegedly "gave Plaintiff Davis a disrespectful look" and said that he would not be permitted to speak until the segment of the meeting known as "public comment," i.e., when audience comments and questions are permitted.  Then Defendant Taylor said to Plaintiff Davis that she would have him removed by security if he raised his hand again . . . ."  Am. Compl. ¶¶ 42-43. Allegedly, "Taylor then requested police officers . . . to come in and watch Plaintiff Davis throughout the remainder of the special meeting."  Id. ¶ 44.  In addition to these actions, Plaintiffs accuse the Board of purposefully delaying a vote regarding Davis's request that they act to place an item on the November 2017 ballot; in support, Plaintiffs allege statements made to him by other Board members, in which they relayed Taylor's intent to delay the vote because she and other Board members "did not like Plaintiff Davis."  Id. ¶ 48.  Davis believes that these actions were retaliations against his filing an Open Meetings Act lawsuit against the Board of Education.  Id. ¶ 50.  Davis further opines that DPS Defendants "targeted" and "threatened" him because he called members of the Board "puppets" of Mayor Duggan.  Id. ¶ 47.

DPS Defendants first point out Davis's implicit concession that he was permitted to speak for the two-minute period afforded to any member of the public.  See DPS Mot. to Dismiss at 7-8. The First Amendment claim, therefore, centers on three things: (i) the instruction that attempts to speak out of turn would result in Davis's removal from the meeting, Am. Compl. ¶ 43; (ii) the presence of Detroit Public Schools Community District police officers, who allegedly were

brought on hand to monitor Davis after his attempt to speak out of turn, id. ¶ 44; and (iii) the alleged delay of the vote, id. ¶ 48.

DPS Defendants argue that it merely imposed reasonable "time, place, and manner restrictions," which "cannot serve as the basis of a claim for denial of free speech." DPS Mot. to Dismiss at 9 (citing Lowery v. Jefferson Cnty. Bd. of Educ., 586 F.3d 427, 432 (6th Cir. 2009)). In the context of his First Amendment claim, Davis does not dispute that the two-minute limitation is reasonable.[9]  Regarding the threat of removal and the presence of law enforcement, DPS Defendants argue that such "subjective chill" cannot satisfy the actual-injury requirement of standing.  See DPS Mot. to Dismiss at 9 (citing Parsons v. U.S. Dep't of Justice, 801 F.3d 701, 710-712 (6th Cir. 2015)).  This is true.

"Generally, standing is found based on First Amendment violations where the rule, policy or law in question has explicitly prohibited or proscribed conduct on the part of the plaintiff." Parsons, 801 F.3d at 711.  The threat to remove Davis from the meeting did not act as a proscription on, or "chill" of, his out-of-turn speech, because out-of-turn speech was already proscribed by the permissible bylaws limiting speech to two minutes.  See DPSCD Bylaws, Ex. E to Pls. Mot. for Summ. J., § 0166.3 (Dkt. 26-6).  The threat to remove Davis, and the presence of law enforcement, merely invoked the "penalty" associated with the permissible restriction on time, place, and manner.  See Lowery, 586 F.3d at 436 ("Courts have upheld removals from public meetings where there appears to have been no written policy at all and only a general prohibition on 'disturbing'

---

[9] Indeed, Lowery — which involved a five-minute restriction on speech at a school board meeting — applies to immunize DPS Defendants' policy.  The meeting was a designated and limited public forum in which the government may limit the time, place, and manner of speech, so long as the limitations are (i) "content-neutral," (ii) "narrowly tailored to serve a significant governmental interest," and (iii) "leave open ample alternative channels for communication of the information." Lowery, 586 F.3d at 432.  The Sixth Circuit then decided that restrictions on speech at a school board meeting, nearly identical to those here, meet these criteria.  Id. at 433.

or 'interrupting' meetings, or 'disrupting, disturbing or otherwise impeding' them." (quoting Jones v. Heyman, 888 F.2d 1328, 1329 n.3 (11th Cir. 1989); White v. City of Norwalk, 900 F.2d 1421, 1426 (9th Cir. 1990)).  Case law permitting reasonable restrictions on the time, place, and manner of speech would mean very little if the public body was not entitled to enforce those restrictions.[10] Because the actions taken by DPS Defendants reflected reasonable restrictions on the time, place, and manner of Davis's speech, Plaintiffs' "chilling" arguments are without merit.

This leaves the matter of the alleged "delay" in the vote.  See Am. Compl. ¶ 48 ("Defendants Board of Education and Defendant Taylor purposely chose to delay the Board's voting on Plaintiffs' June 20, 2017 request.").  Plaintiffs fail, however, to explain the consequences of this delay in Count I of the amended complaint.  See Am. Compl. ¶¶ 32-52.

In addition to claiming that DPS Defendants "chilled" Davis's exercise of his First Amendment rights, Plaintiffs claim that Davis suffered retaliation for exercising, or attempting to exercise, his First Amendment rights.  See id. ¶ 45.  However, the preceding analysis controls this claim, as well.  "The first step in plaintiffs' retaliation claim is to determine whether they were engaged in protected conduct at all.  Absent protected conduct, plaintiffs cannot establish a constitutional violation."  Thaddeus-X v. Blatter, 175 F.3d 378, 395 (6th Cir. 1999).  Per the analysis above, Plaintiffs' attempt to speak out of turn was not protected conduct, regardless of its content.  He was on notice, pursuant to the bylaws, that public comment was limited to a discrete period immediately prior to adjournment.  See DPSCD Bylaws §§ 0165, 0166.3.

Likewise, regarding the delay in the vote — which allegedly occurred following Davis's speech that was protected, i.e., his two-minute speaking allotment — Plaintiffs have failed to plead

---

[10] In fact, in this case, the complained-of acts merely comprised pre-enforcement warnings.  Davis never alleges that he was ejected from the meeting prematurely, or that he was not afforded the two minutes that the bylaws permitted him.

retaliation. In addition to pleading protected activity, a plaintiff also must adequately allege that the retaliation took the form of an "adverse action." See Thaddeus-X, 175 F.3d at 396-397. An official's act is sufficiently adverse if "a person of ordinary firmness would be deterred from" engaging in the protected act. Id. at 398. Because Plaintiffs' allegation of delay in Count I had no alleged harm attached to it, there can be no inference of deterrence. Accordingly, Count I of the amended complaint is dismissed.

### ii. Equal Protection "Class of One"

In Count II of the amended complaint, Plaintiffs argue that DPS Defendants violated Davis's Fourteenth Amendment Equal Protection rights by not waiving the two-minute speaking limit that applied to Davis during the meeting. Id. ¶¶ 62-63. This Court must accept as true Plaintiffs' allegation that the two-minute speaking limit is "repeatedly waived" for the individuals who presented for consideration the particular item at issue. Id. ¶¶ 64, 69. In their response to DPS Defendants' motion, Plaintiffs explain that they are proceeding on a "class of one" theory. See Pls. Resp. to DPS Mot. at 13.

On this point, DPS Defendants argue that Davis had no right to a discretionary decision being made in his favor, and no authority exists that "would make Taylor's behavior reviewable (for what would theoretically be an abuse of discretion), by this Court." See DPS Mot. to Dismiss at 8.

Plaintiffs repeat that there was no rational basis for denying Davis a discretionary extension of speaking time, citing the practice of granting extensions to similarly situated attendees and the fact that a member of the School Board told Davis that the extension was not granted because Taylor and other members of the Board "strongly disliked" Davis. See Pls. Resp. to DPS Mot. at 14-15; see also Am. Compl. ¶ 70 ("A member of the Defendant Board of Education informed

Plaintiff Davis after the meeting, that the <u>only reason</u> Defendants Board of Education and Taylor did not honor Plaintiff Davis' request to waive the two (2) minute speaking limit, was that some members of the Defendant Board of Education strongly disliked Plaintiff Davis and that included Defendant Taylor." (emphasis added)).

The Equal Protection Clause "prohibits discrimination by government which either burdens a fundamental right, targets a suspect class, or <u>intentionally treats one differently than others similarly situated without any rational basis for the difference</u>." <u>TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio</u>, 430 F.3d 783, 788 (6th Cir. 2005) (emphasis added). "[T]he class-of-one theory of equal protection . . . presupposes that like individuals should be treated alike, and that to treat them differently is to classify them in a way that must survive at least rationality review . . . ." <u>Engquist v. Oregon Dep't of Agr.</u>, 553 U.S. 591, 605 (2008). A "class of one" plaintiff may demonstrate that a government action lacks a rational basis in one of two ways: either by negating "every conceivable basis which might support the government action or by demonstrating that the challenged government action was <u>motivated by animus or ill-will</u>." <u>Warren v. City of Athens, Ohio</u>, 411 F.3d 697, 711 (6th Cir. 2005) (emphasis added). It is not necessarily dispositive that the decision at issue was discretionary. See <u>Franks v. Rubitschun</u>, 312 F. App'x 764, 766 & n.3 (6th Cir. 2009) (rejecting the argument that "individualized, discretionary decisions can rarely, if ever, be challenged in class-of-one actions")

Plaintiffs do not attempt to negate every conceivable basis that might have supported the Board's decision not to grant Davis an extension of speaking time. Instead, they claim to have demonstrated animus or ill-will because a member of the School Board told Davis that the extension was not granted because Taylor and other members of the Board "strongly disliked"

Davis due to his lawsuit against the Board and his public, personal, and harsh criticisms of Board members.

Plaintiffs have sufficiently alleged ill-will.  In Paterek v. Village of Armada, Michigan, 801 F.3d 630, 650 (6th Cir. 2015), the defendant admitted that it decided to impose odious restrictions on the plaintiff business's zoning variance because of a "personality conflict."  The court held that this admission "alone" would permit a jury to find the requisite animus.  Here, Plaintiffs need only survive DPS Defendants' motion to dismiss — meaning that this Court takes as true his allegations about what certain School Board members relayed to him about Taylor and other Board members' motivations.

DPS Defendants offer no legal support for their claim that, simply because a decision is technically discretionary, a plaintiff cannot maintain a class-of-one claim in connection with that decision.  To the extent that Defendants' position might be true on these facts, it certainly is not true as a bright-line rule.  See Franks, 312 F. App'x at 766; cf. Paterek, 801 F.3d at 650 (fact that similarly situated persons were "allowed to operate" their business without certificate of occupancy supported class-of-one claim).  Plaintiffs alleged that (i) it was typical for DPS Defendants to waive the limit to persons similarly situated to Davis; and, (ii) crucially, but for the animus that was adequately alleged, Taylor and the Board would have afforded Davis the speaking-time extension.  DPS Defendants have failed to carry their burden to show that there the amended complaint fails to state a class-of-one claim on which relief can be granted.

### iii.  Procedural Due Process

In Count III of the amended complaint, Davis argues that his Fourteenth Amendment right to due process was violated because DPS Defendants are "biased decisionmakers"; this bias allegedly exists because Detroit's Mayor, Mike Duggan, financially supported the campaigns of a

majority of School Board members and instructed them to resist Davis's efforts.  See id. ¶¶ 75-76.

In support, Davis claims:

> A member of the Defendant Board of Education informed Plaintiff
> Davis that certain members of the Defendant Board of Education,
> including Defendant Taylor, have been told by Detroit Mayor Mike
> Duggan to block and delay Plaintiffs' attempt to have the question
> placed on the November 2017 General Election ballot.

Id. ¶ 77.  Elsewhere in the amended complaint, Plaintiffs allege that Davis called Taylor and the

Board "puppets" of the mayor on a popular radio show, which Plaintiffs claim also supports a

finding of bias.  See Am. Compl. ¶ 47.

DPS Defendants' motion to dismiss addresses the bias claim by arguing that Plaintiffs

cannot have a liberty interest in having the question placed on the ballot.  See DPS Mot. to Dismiss

at 10-13.  They also argue that actionable "bias" must be objective, such as a financial or familial

conflict of interest, or the product of abuse against the decisionmaker that is personal in nature.

Id.; see also DPS Resp. to Pls. Mot. at 8 (Dkt. 35).

A "fair trial in a fair tribunal is a basic requirement of due process."  In re Murchison, 349

U.S. 133, 136 (1955).  "This applies to administrative agencies which adjudicate as well as to

courts."  Withrow v. Larkin, 421 U.S. 35, 46 (1975) (citing Gibson v. Berryhill, 411 U.S. 564, 579

(1973)) (emphasis added).  "Actual bias" includes not only "cases . . . in which the adjudicator has

a pecuniary interest in the outcome," but also those "in which he has been the target of personal

abuse or criticism from the party before him."  Withrow, 421 U.S. at 47.

Unlike all bias cases uncovered by this Court, the School Board's decisions regarding

Davis's speaking time and/or the ballot were not "adjudications." Bias is universally framed as

something that poses an impediment to adjudications that comport with due process.

Adjudications typically are associated with a judicial process, in which a body of set rules are

applied to a dispute.  The School Board, however, was engaged in a legislative, policymaking

process, in which course it was not bound to apply a body of law in the fashion of an adjudicator. Davis appeared before the Board to offer his views, but he was not a party seeking an adjudication of how rules apply to his circumstances, claims, or contentions.  The Board owed him no duty beyond that which it affords to all others who wish to be heard.

Relatedly, for bias to be actionable, the underlying decision must affect an interest protected by due process:  that is, life, liberty, or property.  See EJS Props., LLC v. City of Toledo, 698 F.3d 845, 860 (6th Cir. 2012) ("Although a compelling proposition, we decline to create today a new liberty interest in corruption-free decision making. . . .  [W]e see no compelling reason to create a constitutional remedy for such behavior absent a protected interest at stake.").

Plaintiffs claim that the interest they seek to vindicate here — the interest in voting on the use of millage funds, which allegedly requires DPS Defendants to first affirmatively place that question on the ballot — is a "liberty" interest created by state law.  See Pls. Resp. to DPS Mot. at 17; see also Am. Compl. ¶ 101.

"State-created liberty interests arise when a state places 'substantive limitations on official discretion.'" Tony L. By & Through Simpson v. Childers, 71 F.3d 1182, 1185 (6th Cir. 1995) (quoting Olim v. Wakinekona, 461 U.S. 238, 249 (1983)).  "A state substantively limits official discretion by establishing 'substantive predicates' to govern official decisionmaking and, further, by mandating the outcome to be reached upon a finding that the relevant criteria have been met." Id. (quoting Olim, 461 U.S. at 249).  "The state statutes or regulations in question also must use explicitly mandatory language requiring a particular outcome if the articulated substantive predicates are present."  Id. (quoting Olim, 461 U.S. at 249).  "Finally, the statute or regulation must require a particular substantive outcome."  Id.  Plaintiffs agree that this is the governing legal framework.  See Pls. Resp. to DPS Defs. Mot. at 18-19.

23

DPS Defendants are correct; their decision whether to place the issue on the ballot is wholly discretionary, and there are no identified state limits on their discretion.  See also Mich. Comp. Laws § 380.11a(10) (permitting that the school board "may" submit a question to the electors that it "considers proper"); Hillsdale Co. Senior Servs., Inc. v. Hillsdale Co., 832 N.W.2d 728, 734 n.11 (Mich. 2013) (a statute defines a ministerial (i.e., non-discretionary) duty "with such precision and certainty as to leave nothing to the exercise of discretion or judgment"); Browder v. Int'l Fid. Ins. Co., 321 N.W.2d 668, 673 (Mich. 1982) ("[C]ourts should give the ordinary and accepted meaning to the mandatory word 'shall' and the permissive word 'may' unless to do so would clearly frustrate legislative intent as evidenced by other statutory language or by reading the statute as a whole.").

Such unbounded discretion precludes a procedural due process claim.  To show a liberty interest that DPS Defendants are denying to Plaintiffs without due process of law, Plaintiffs would have to point to a legal framework according to which DPS Defendants are mandated, under the circumstances, to place an item on the ballot.  But Plaintiffs have merely argued that Intervenor Defendants have violated the statutes at issue, and that, for some reason that is not altogether clear, DPS Defendants in particular must take steps to remedy this prospectively.  Notwithstanding the merits of Plaintiffs' claims about the use of millage funds and whether the 2012 ballot language complied with state law, they point to no "explicit mandatory language" requiring the School Board to take affirmative action to place this matter on a ballot or otherwise assist Plaintiffs and other electors in vindicating their statutory rights.

Plaintiffs argue that mandatory language contained in Mich. Comp. Laws § 380.1216 imposes the requisite limits on DPS Defendants' discretion.  See Am. Compl. ¶¶ 108-109, 117; Pl. Resp. to DPS Mot. at 17.  That statute reads, in part, that "money raised by tax shall not be used

for a purpose other than that for which it was raised without the consent of a majority of the school electors." Mich. Comp. Laws § 380.1216 (emphasis added.) But this statutory language is utterly unconnected to anything having to do with DPS Defendants. It restricts the spending of the tax money, and there is no allegation that DPS Defendants are spending the money, or using it, for a non-school purpose.

Count IV contained the allegation of the alleged due process violation that was the basis for the bias claim. See Am. Compl. ¶¶ 93-94, 119 ("[DPS Defendants'] refusal to place said question on the November 2017 General Election ballot violates Plaintiff Wilcoxon's right to procedural due process . . . ."). Accordingly, Counts III and IV of the amended complaint are dismissed for the same reason: Plaintiffs' asserted interest is not a liberty interest that their right to due process protects.

### iv. Substantive Due Process

In Count V of the amended complaint, Plaintiffs allege that the same facts supporting Count IV also comprise a substantive due process violation, with the requisite fundamental right being the "fundamental constitutional right to vote" on the use of millage funds. Am. Compl. ¶ 136. Both DPS Defendants and Intervenor Defendants argue that there is no such right. See DPS Mot. to Dismiss at 14; Intervenor Defs. Mot. for Summ. J. at 9.

Defendants are correct. As a matter of law, Plaintiffs have not stated a substantive due process claim based upon Defendants "not permitting Plaintiff Wilcoxon and the other registered and qualified electors of the City of Detroit to vote on the question" of the use of millage funds, Am. Compl. ¶ 138. The cases that Plaintiffs use to connect their voting-rights claims to the doctrine of substantive due process are, in fact, equal protection cases. See id. ¶ 137; Pls. Resp. to DPS Mot. at 22; Pls. Resp. to Intervenor Defs. Mot. at 15-16 (each citing Obama for Am. v. Husted,

697 F.3d 423, 428 (6th Cir. 2012) ("[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." (quoting Dunn v. Blumstein, 405 U.S. 330, 336 (1972)); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 664 (1966)). Nothing in Plaintiffs' filings plausibly establishes the existence of the "right" they invoke.  As framed by the cases that Plaintiffs cite, the right to vote is an equal-protection right to have one's vote cast and counted fairly, on equal footing with the rest of the electorate.

Even if Plaintiffs are presumed to have cited the correct case law to support their claim, it still fails.  Although it is true that "the Supreme Court has never recognized the right to vote as a right qualifying for substantive due process protection," Phillips v. Snyder, No. 2:13-CV-11370, 2014 WL 6474344, at *6 (E.D. Mich. Nov. 19, 2014), aff'd, 836 F.3d 707 (6th Cir. 2016), the Sixth Circuit has held that "[t]he Due Process Clause is implicated, and § 1983 relief is appropriate, in the exceptional case where a state's voting system is fundamentally unfair," League of Women Voters of Ohio v. Brunner, 548 F.3d 463, 478 (6th Cir. 2008).  Intervenor Defendants acknowledge this route to relief.  See Intervenor Defs. Mot. for Summ. J. at 10 (citing Ne. Ohio Coal. for Homeless v. Husted, 696 F.3d 580 (6th Cir. 2012)).

Nevertheless, these cases are distinguishable.  League of Women Voters involved "non-uniform rules, standards, and procedures" involving missing names from the voter rolls, inadequate numbers of voting machines, and the improper refusal of assistance to disabled voters, etc., all of which resulted in "massive disenfranchisement and unreasonable dilution of the vote." 548 F.3d at 478.  Northeast Ohio Coalition for the Homeless involved "poll-worker error [that] cause[d] thousands of qualified voters to cast wrong-precinct ballots from the correct polling locations."  696 F.3d at 597.

Very recently, however, the Sixth Circuit in <u>Phillips v. Snyder</u>, 836 F.3d 707 (6th Cir. 2016), instructed that these cases are to be interpreted narrowly.  <u>Phillips</u> rejected the argument that an entire jurisdiction had a due process right to vote for legislative representatives in a state election.  Distinguishing both <u>League of Women Voters</u> and <u>Northeast Ohio Coalition for the Homeless</u>, <u>Phillips</u> held that these cases "address[ed] whether states' entire election processes impaired citizens' abilities to participate in state elections <u>on an equal basis with other qualified voters</u>."  <u>Phillips</u>, 836 F.3d at 716 (emphasis added).[11]  Thus, although case law recognizes that a substantive due process right to vote may come into play upon a showing of "fundamental unfairness," the requisite unfairness still only arises when a profound irregularity comprises "non-uniform rules, standards, and procedures."

Also relevant is the fact that Plaintiffs' substantive due process claim is explicitly premised upon a violation of a state statute.  <u>See</u> Am. Compl. ¶ 123.  This confirms that they are, in fact, arguing a state-law issue of statutory interpretation, rather than flagging an irregularity of such obvious magnitude that it offends the Constitution.

In light of <u>Phillips</u>' clear intent to limit any substantive due process voting rights claim to circumstances of unequal or arbitrary treatment of individual voters — rather than the circumstances alleged by Plaintiffs that <u>every</u> voter was allegedly wronged in the <u>exact same way</u> — Count V of Plaintiffs' amended complaint is dismissed.

---

[11] In addition to <u>League of Women Voters</u> and <u>Northeast Ohio Coalition for the Homeless</u>, <u>Phillips</u> recognized that a substantive due process right to vote was acknowledged in <u>Warf v. Board of Elections of Green County, Kentucky</u>, 619 F.3d 553 (6th Cir. 2010).  <u>Warf</u> involved a challenge to a state court judgment declaring void all <u>absentee</u> ballots cast in the general election for county clerk; as such, <u>Warf</u>, too, contemplated the right to vote as a right that should be understood in terms of fairness vis-à-vis the electorate at large.  <u>See id.</u> at 559-560.

This Court also dismisses Count VII of the amended complaint for the reasons stated above. In that count, Plaintiffs accuse the Community District and the Board of Education of "seek[ing] to enforce the 2012 DDA Act Amendments without giving effect to [Mich. Comp. Laws § 380.1216]."  Am. Compl. ¶ 193.[12]  They claim that this activity "violated and infringed upon Plaintiff Wilcoxon to exercise her fundamental and statutory right to vote."  Id. ¶ 197.[13]  Intervenor Defendants aptly refer to Count VII as "non-specific."  Because Count VII raises no unique facts, causes of actions, or other theories of liability, it is dismissed for the reasons applicable to Counts III through V.[14]

### v.  Voting Rights Act

In Count VI of the amended complaint, Plaintiffs invoke Section 2 of the Voting Rights Act of 1965 ("VRA"), 52 U.S.C. § 10301, which provides:

> No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or

---

[12] Plaintiffs' claim that DPS Defendants "enforced" the tax increment financing statutes apparently refers to DPS Defendants' counsel's opinion, stated at a June 23, 2017 special meeting, that the instant financing scheme was lawful.  See Am. Compl. ¶ 146.

[13] In the portion of the amended complaint that summarizes the various counts, Plaintiffs frame Count VII as follows:

> Plaintiff D. Etta Wilcoxon alleges in Count VII of the Amended Complaint that a declaratory judgment should be issued, declaring that Defendants' actions of not enforcing Mich. Comp. Laws § 380.1216 of the Revised School Code have infringed upon her fundamental constitutional right to vote.

Am. Compl. ¶ 11.

[14] To the extent that Plaintiffs intended Count VII to bring a cause of action under Michigan statutory law, versus a principle of constitutional law, it is dismissed on the basis of standing and, in the alternative, Bigger, see supra.

> abridgement of the right of any citizen of the United States to vote
> on account of race or color . . . .

"The essence of a § 2 claim is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." Thornburg v. Gingles, 478 U.S. 30, 47 (1986).

Under Michigan's statutory scheme, downtown development authorities such as the DDA are permitted to capture tax increment revenues from school taxes for the purposes of financing a "catalyst development project." See Mich. Comp. Laws §§ 125.161(g), 125.1664(6). Catalyst development projects are possible within municipalities with a population greater than 600,000. See Mich. Comp. Laws § 125.1651(g). Plaintiffs allege that Detroit — a majority African-American city — is the only municipality of this size in Michigan. See Am. Compl. ¶¶ 149-150 (citing census bureau).

Plaintiffs appear to argue that, because tax increment-financed catalyst development projects can only occur in Detroit (practically speaking), DPS Defendants' refusal to address the alleged violation of Mich. Comp. Laws § 380.1216 has a racially "discriminatory effect" that violates the VRA. See Am. Compl. ¶¶ 166-168.

Plaintiffs fail to state a claim under § 2 of the VRA. Given that tax increment financing occurs throughout Michigan, Plaintiffs do not explain how "catalyst development projects," in particular, have any kind of deleterious effect on Detroit voters. Plaintiffs appear to imply that catalyst development projects are the only tax-increment financed projects that can capture school millage revenue, see Am. Compl. ¶ 153 ("The 2012 DDA Act Amendments provided that costs associated with . . . a 'catalyst development project' may be paid or reimbursed out of captured tax increment revenues derived from state and local school taxes . . . ."), but school taxes have been eligible for capture under Michigan's tax increment financing scheme since long before the 2012

DDA Act Amendments added "catalyst development projects," see, e.g., In re Request for Advisory Opinion on Constitutionality of 1986 PA 281, 422 N.W.2d 186, 192 (Mich. 1988) (noting amicus's objection to tax increment capture of Livingston County school millage funds); see also 2014 Mich. Op. Atty. Gen. No. 7280, 2014 WL 7139514, at *2 (Dec. 10, 2014) (discussing 2012 PA 396's inclusion of "catalyst development projects" in pre-existing list of permissible uses for tax increment financing that originate from school taxes).

Moreover, as best this Court can tell, Plaintiffs' true dispute is with Michigan's legislature, for creating a scheme under which only Detroit is susceptible to catalyst development projects and whatever special financing characteristics might apply to such projects. Plaintiffs' complaint singles out the statutes, rather than the acts of any defendants, as the cause of the problem. See Am. Compl. ¶¶ 172 ("Thus, the 2012 DDA Act Amendments only adversely and disparately affect the voters of the City of Detroit, which are majority African American."), 173 ("[T]he school electors . . . are being denied their right to vote because the 2012 DDA Act Amendments permits the capture of local school taxes . . . ."). Putting the matter to a vote would not change Detroit's underlying susceptibility to the scheme — yet that is what Plaintiffs protest in this count. Plaintiffs' lawsuit seeks to conscript DPS Defendants into remedying this allegedly discriminatory scheme; but DPS Defendants are not the cause of Intervenor Defendants' use and/or allocation of the funds, nor are they the cause of the statutory scheme governing Intervenor Defendants' activity. Accordingly, Count VI is dismissed.

### E. Plaintiffs' Objection to Conversion to Motion for Summary Judgment

On July 12, 2017, Intervenor Defendants filed a motion to dismiss (Dkt. 27). All of the exhibits attached thereto dealt with Intervenor Defendants' argument under Bigger. On the same day, this Court sua sponte converted the motion to dismiss to a motion for summary judgment

pursuant to Federal Rule of Civil Procedure 12(d) (Dkt. 29), so that Plaintiffs would be on notice of their ability to submit evidence in response to Intervenor Defendants' motion.

Thereafter, Plaintiffs filed two substantially identical affidavits, which indicated (i) Plaintiffs' desire to obtain expert testimony to support certain of their claims and/or rebut certain of Defendants' arguments; and (ii) that Plaintiffs cannot obtain this testimony within the period of briefing that this Court set on July 10, 2017. See generally 7/13/2017 Wilcoxon Aff. (Dkt. 32); 7/13/2017 Davis Aff. (Dkt. 33). Although Plaintiffs' affidavits request no particular relief, this Court construes them as requests to adjourn the expedited briefing schedule and/or rescind its conversion of Intervenor Defendants' motion.

Plaintiffs' request is denied. The controlling rationale for rejecting the state-law claims, apart from mandamus, was standing. No part of this Court's decision on that matter relied upon disputed issues of fact. As to those counts, this Court's conversion of Intervenor Defendants' motion had no impact.

Even concerning the mandamus claim found in Count IX — the only state-law claim not resolved on standing grounds — it was not inappropriate to convert Intervenor Defendants' motion. To rebut Intervenor Defendants' successful Bigger argument, Plaintiffs' need for additional "discovery" was limited to information showing that the public lacked knowledge about the Little Caesar's arena project. No conceivable discovery, however, would undermine the import of Intervenor Defendants' exhibits, except for evidence showing that those exhibits were forgeries. But Plaintiffs never contested the factual allegations that Intervenor Defendants used their exhibits to support. In fact, none of the discovery that Plaintiffs want would bear on taxpayer notice of the Little Caesar's arena project. See generally 7/13/2017 Wilcoxon Aff.; 7/13/2017 Davis Aff. Absent a challenge to Intervenor Defendants' exhibits' authenticity, Plaintiffs could only challenge

their legal significance, and converting Intervenor Defendants' motion did not hinder them from doing so.[15]

"Whether notice of conversion of a motion to dismiss to one for summary judgment by the court to the opposing party is necessary depends upon the facts and circumstances of each case." Salehpour v. Univ. of Tenn., 159 F.3d 199, 203 (6th Cir. 1998).  On the facts and circumstances of this case, including the history of its companion, Davis I, this Court is convinced that Plaintiffs have not been surprised or prejudiced by the instant conversion of Defendants' motion to one for summary judgment, which conversion, practically speaking, pertained only to the Count IX and the Bigger issue.

### F.  Plaintiffs' Ex Parte Motion for Leave to File Supplemental Brief (Dkt. 43)

On July 18, 2017, Plaintiffs filed a motion for leave to file a one-page supplemental brief (Dkt. 43).  The purpose of the supplemental brief is to include "certain arguments with respect to Plaintiffs' verified complaint."  See Pl. Mot. for Leave to File Supp. Br. at 2 (quoting Williams v Browman, 981 F.2d 901, 905 (6th Cir. 1992) ("[A] verified complaint . . . would have the same force and effect as an affidavit and would give rise to genuine issue of material fact.")). Presumably, Plaintiffs wish to alert this Court to the rule of law that allegations in a verified complaint can be used to establish a genuine issue of material fact in opposing a motion for summary judgment.  Plaintiff Davis attached to Plaintiffs' motion for partial summary judgment an affidavit, which averred "[t]hat all of the allegations as pled and alleged in the Amended

---

[15] Notably, in the previous action that Plaintiffs insisted was a companion to this one, Defendants raised an identical Bigger argument using identical exhibits.  See Defs. 6/15/2017 Mot. to Dismiss & Exs., Davis v. Downtown Dev. Auth., Case No. 17-11742 (E.D. Mich. June 18, 2017) ("Davis I") (Dkt. 32 to 32-8).  Plaintiffs should have anticipated the same argument in the instant case.

Complaint and Motion for Summary Judgment are true and correct." See 7/11/2017 Davis Aff, Ex. 1 to Pls. Mot. for Summ. J., ¶ 18 (Dkt. 26-2).

Plaintiffs' motion is denied as moot. This Court is aware of the pertinent rule of law, and Plaintiffs attribute their need for this supplemental affidavit to neglect. See Pls. Mot. for Leave to File Suppl. Br. at 2. More importantly, except for this Court's application of the Bigger doctrine, the contents of the complaint were taken as true and the issues were decided as a matter of law. And the amended complaint contains no facts within Davis's personal knowledge that bear on the Bigger issue.

## IV.  CONCLUSION

For the reasons set forth above, DPS Defendants' motion to dismiss (Dkt. 25) is granted in part and denied in part. Intervenor Defendants' motion for summary judgment (Dkt. 27) is granted. Plaintiff's motion for partial summary judgment (Dkt. 26) is denied as moot. Plaintiffs' objection to this Court's July 12, 2017 order converting Intervenor Defendants' motion (Dkts. 32, 33) is overruled. Plaintiffs' motion for leave to file a one-page supplemental brief (Dkt. 43) is denied.

Intervenor Defendants, Olympia Entertainment, and Palace Sports are dismissed from the case. The lawsuit survives as to Counts II, XV, and XVI of the amended complaint only. All other counts are dismissed with prejudice.

SO ORDERED.

Dated:  July 24, 2017                                    s/Mark A. Goldsmith
    Detroit, Michigan                            MARK A. GOLDSMITH
                                            United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on July 24, 2017.
                                   s/Karri Sandusky
                                   Case Manager